Filed 1/31/22  P. v. Joseph CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JORDAN EMON JOSEPH,<br><br>    Defendant and Appellant. | B309455<br><br>(Los Angeles County Super. Ct. No. YA093603) |

APPEAL from an order of the Superior Court of Los Angeles County, Alan B. Honeycutt, Judge.  Affirmed.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, and Michael C. Keller and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Jordan Joseph (defendant) was 17 years old when he shot and killed Kody Cook (Cook) as Cook sat in his car. A jury convicted defendant of second degree murder and found true various firearm enhancements. In a prior appeal (*People v. Joseph* (May 30, 2018, B278013) [nonpub. opn.] (*Joseph I*)),[1] we conditionally reversed the judgment and remanded with directions to reassess whether defendant was fit for juvenile proceedings and, if not, to decide whether the court wished to exercise newly conferred discretion to strike a 25-to-life firearm enhancement that was a component of defendant's 40 years to life prison sentence. In this appeal from the trial court's order declining to strike the firearm enhancement, we consider whether the trial court abused its discretion and whether defendant's aggregate sentence of 40 years to life is cruel and unusual punishment.

## I. BACKGROUND

### A. *Trial*

Following a juvenile court determination that defendant was not fit for a juvenile court disposition, the Los Angeles County District Attorney charged defendant with Cook's murder in a court of criminal jurisdiction. Cook's friend, Shage Miller (Miller), testified that he, Cook, and another friend were smoking

---

[1] We granted defendant's motion for judicial notice of our unpublished opinion in his direct appeal (Evid. Code, §§ 451, subd. (a), 452, subd. (d), 459, subd. (a)), and we draw on that opinion in reciting the pertinent background facts.

marijuana in Cook's parked BMW on the day of the murder.[2] They saw defendant leaning against a van parked further up the street. Cook drove up to him and asked, "What's up?" There was a brief "stare-down," and Cook drove away. Later the same day, Miller and Cook sat in Cook's BMW in the parking lot outside a Baskin Robbins waiting for another friend. Miller was in the front passenger seat. About two minutes after they parked, Miller saw defendant "walking, slightly jogging up to the car." Defendant said "what's up now" before firing six shots. Cook was hit once in the neck and three times in the head.

Defendant testified that someone in Cook's BMW brandished a rifle at him when they drove by him earlier in the day. (Miller testified there was never a gun inside the BMW.) Defendant had his friend drive him to his grandparents' house, where defendant retrieved money and his grandfather's gun because he was afraid the occupants of the BMW would "see [him] again and shoot [him]." According to defendant, he and his friend were on their way to another friend's house when they stopped at a shop that shares a parking lot with Baskin Robbins. Cook's BMW happened to be parked near the front of the shop, defendant said "hey," and Cook cursed at him and reached for a silver handgun. Defendant pulled out his grandfather's gun in response and "just started shooting it" because he "was afraid [Cook] was gonna shoot [him]."

Additional evidence and testimony corroborated Miller's account of the shooting. No gun was recovered from the BMW, and defendant did not mention seeing Cook reach for a silver

[2]     Miller testified at defendant's preliminary hearing, but the parties stipulated he was unavailable at trial. His preliminary hearing testimony was read into the record.

3

handgun when he first spoke to police. Surveillance video from the parking lot showed defendant's friend's van drive past the entrance to the parking lot nearest Cook's BMW, make a U-turn, return to the lot through a different entrance, and back into a space around a corner from Cook. Delwaun "DJ" Beard (Beard), Miller's friend who was meeting Miller and Cook at Baskin Robbins, testified he was looking for a parking spot when he heard "kind of like talking back and forth" and "basically like someone saying, 'what's up,' walking up." Beard heard gunshots and saw defendant's arm raised toward the BMW. Beard parked and ran toward Miller, who by then had exited the BMW. Beard saw no weapons on Miller and saw no weapons inside the BMW.

A customer leaving a shop that shares a parking lot with Baskin Robbins saw defendant "yelling and shooting at" Cook. He did not see Cook display a weapon or yell at defendant, but he also admitted he could not see Cook's waist or anything below that level. A clerk inside the shop testified he saw defendant and his friend approach the BMW and look at it "like they were trying to make sure who was in the car." Defendant's friend walked away as defendant moved closer to the BMW. The clerk heard multiple voices shouting and saw defendant shoot Cook. The clerk had a poor view of the car, but he did not see Cook make a hostile gesture toward defendant.

The jury found defendant guilty of second (not first) degree murder and found true allegations that he used a firearm within the meaning of Penal Code³ section 12022.53, subdivisions (b) through (d). The court imposed a sentence of 15 years to life for

---

³ Undesignated statutory references that follow are to the Penal Code.

the murder plus 25 years to life for the section 12022.53, subdivision (d) firearm enhancement.

### B.     Direct Appeal

On direct appeal, we rejected defendant's arguments that the conviction was the product of instructional error and prosecutorial misconduct.  (*Joseph I*, *supra*, B278013.)  We did, however, hold (1) defendant was entitled to the benefit of retroactive changes in the law changing the criteria used to determine when a minor accused of murder is fit for adjudication in juvenile court and (2) the trial court should have the opportunity to decide whether, in the interest of justice, to strike the section 12022.53 firearm enhancement if the matter remained in adult court.  (*Ibid.*)  We conditionally reversed the judgment and remanded the cause to the juvenile court with directions to conduct a new fitness hearing.  If, after the fitness hearing, the juvenile court determined it would transfer defendant to a court of criminal jurisdiction under current law, the judgment of conviction was to be reinstated and the cause transferred to the trial court to permit the court, if it so chose, to exercise its discretion to strike the section 12022.53 enhancement.  (*Ibid.*)

### C.     Proceedings on Remand

On remand, the juvenile court determined defendant would be transferred to a court of criminal jurisdiction and the trial court held a hearing in September 2020 to consider striking the section 12022.53 enhancement.  Defendant's attorney asked the trial court to strike the enhancement based on defendant's age at the time of the murder, his lack of any other criminal history, and

5

defendant's "impeccable" record in prison, where he avoided fights and enrolled in college courses.[4]  Defendant apologized to Cook's family and said he was committed to changing his life and redeeming himself.  The prosecution argued Cook was "sitting in a car . . . , minding his own business when [defendant] came up and ambushed him and executed him with a gun" and "this case really was all about the use of that firearm and the damage that it caused . . . ."

The trial court remarked that this was "probably one of the very few cases in my 13 years on the bench that have actually really affected me.  For quite some time I was just taken aback by the senseless loss of life, the loss of [Cook], the loss of [defendant].  The families on both sides have lost their young people. . . .  It's a tragedy all the way around."  The trial court indicated it had "read that [defendant] was doing very well," and this was "not some ploy by him."  The trial court continued:  "He was a young man.  The way that he presents himself today, before we came on the camera with all of us on, I can see him and I can see, just by the way he was sitting there and carrying himself, [he] was a totally different person from the way that he was in my courtroom."

The trial court determined that, "[f]or whatever reason, [defendant] decided to retrieve that gun because he had been disrespected, that [Cook] and his friends were saying things to them, giving them the wrong look.  And it wasn't a matter of a fortuitous situation where they met again.  [Defendant] and his friends drove and went specifically looking for [Cook], and they found him."  The trial court concluded "[i]t would be an abuse

---

[4]     The appellate record does not include any documentary evidence regarding defendant's post-conviction conduct.

6

of . . . discretion under the facts of this particular case to strike the enhancement."

## II. DISCUSSION

Under the deferential abuse of discretion standard that governs our review of the trial court's decision not to strike or dismiss the 25-to-life firearm enhancement, the trial court did not err. The trial court correctly determined that defendant's decision to arm himself and confront someone who disrespected him is precisely the sort of conduct section 12022.53, subdivision (d) was meant to punish. We also follow settled law that we should not infer from a silent record that the trial court was unaware of its ability to strike the enhancement under section 12022.53, subdivision (d) and impose a shorter sentence under sections 12022.53, subdivision (b) or (c).

Defendant also asks us to consider whether his sentence of 40 years to life, which he characterizes as "de facto life without the possibility of parole," is cruel and unusual. This characterization of defendant's sentence is inaccurate, however, in light of his eligibility for youth offender parole consideration during his 25th year of incarceration.

### A.   *The Trial Court Did Not Abuse Its Discretion in Declining to Strike the Firearm Enhancement*

Section 12022.53 establishes sentencing enhancements of varying lengths for specified crimes involving a firearm—including murder—depending on how the firearm is used and the harm that results from its use. (§ 12022.53, subd. (a)(1).) Subdivision (b) provides for a 10-year enhancement for one who "personally uses a firearm" in commission of the offense;

7

subdivision (c) provides for a 20-year enhancement for one who "personally and intentionally discharges a firearm"; and subdivision (d) provides for an enhancement of 25 years to life for one who "personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death . . . ." (§ 12022.53, subds. (b)-(d).) "The legislative intent behind section 12022.53 is clear: 'The Legislature finds and declares that substantially longer prison sentences must be imposed on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crime.' [Citation.]" (*People v. Garcia* (2002) 28 Cal.4th 1166, 1172; accord *People v. Palacios* (2007) 41 Cal.4th 720, 733.) Senate Bill No. 620 (2017-2018 Reg. Sess.) (Senate Bill No. 620), effective January 1, 2018, amended section 12022.53 to permit the trial court to strike or dismiss these enhancements in the interest of justice pursuant to section 1385. (§ 12022.53, subd. (h).) As we held in defendant's prior appeal, Senate Bill No. 620 applies retroactively to him.

We review the trial court's decision not to strike or dismiss a section 12022.53 firearm enhancement for abuse of discretion. (See *People v. Pearson* (2019) 38 Cal.App.5th 112, 116 (*Pearson*).) In assessing whether defendant has met his burden to demonstrate an abuse of discretion (*Pearson*, *supra*, at 116), we consider the legal principles and policies behind the laws at issue. (*People v. Carmony* (2004) 33 Cal.4th 367, 377; *People v. Williams* (1998) 17 Cal.4th 148, 161.) Here, that includes both the law that added section 12022.53 to the Penal Code and Senate Bill No. 620's purpose of mitigating the overly harsh results that might otherwise obtain from mandatory, inflexible imposition of section 12022.53 enhancements. It also includes the general objectives in sentencing, factors affecting imposition of

8

enhancements, and circumstances in aggravation and mitigation set forth in California Rules of Court, rules 4.410, 4.428, 4.421, and 4.423, respectively.  (*Pearson*, *supra*, at 117.)

The trial court in this case considered various factors in mitigation—including defendant's youth and the manner in which prison had changed him—and concluded the 25-to-life enhancement was warranted based on the circumstances of the murder.  Imposing this sentence based on defendant's decision to arm himself and confront Cook, who sat unarmed and vulnerable in his car, is fully consistent with section 12022.53's public protection and deterrence rationales, even as tempered by Senate Bill No. 620.  Defendant's contention that Cook provoked him (Cal. Rules of Court, rule 4.423(a)(2)) earlier in the day, at a different location, before defendant decided to arm himself does not alter this analysis.  Nor does defendant's reliance on what he cites as mitigating factors, such as his lack of any prior criminal history.  (See *Pearson*, *supra*, 38 Cal.App.5th at 117 ["'[U]nless the record affirmatively reflects otherwise,'" the trial court is "deemed to have . . . considered" the "factors enumerated in" the California Rules of Court, citing Cal. Rules of Court, rule 4.409].)

Defendant suggests the trial court did not understand its discretion to impose a 10 or 20-year firearm enhancement under section 12022.53, subdivisions (b) and (c) in lieu of the 25-to-life enhancement under section 12022.53, subdivision (d).  Plaintiff relies on *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*), in which the Court of Appeal reversed a sentence imposing a section 12022.53, subdivision (d) enhancement because the trial court was not aware of its discretion to impose an *uncharged* enhancement under section 12022.53, subdivision

(b) or (c).[5] (*Id.* at 222-223.) We are not persuaded that *Morrison* has any application to this case, in which the jury found enhancements under section 12022.53, subdivisions (b) and (c) to be true. Application of a subdivision (b) or (c) enhancement would simply have been the consequence of striking the subdivision (d) enhancement—not an alternative that may or may not have occurred to the trial court. In any case, as the Court of Appeal acknowledged even in *Morrison*, "after the publication of [that opinion], the usual presumption that a sentencing court correctly applied the law will apply and will ordinarily prevent remand where the record is silent as to the scope of a court's discretion."[6] (*Id.* at 225; accord *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390 ["Absent evidence to the contrary, we presume that the trial court knew and applied the governing law"].)

B.      *Defendant's Sentence Is Not Cruel and Unusual*
As a preliminary matter, defendant's constitutional challenge is forfeited on appeal because he did not raise it in the trial court. (*People v. Baker* (2018) 20 Cal.App.5th 711, 720 ["A claim that a sentence is cruel or unusual requires a 'fact specific' inquiry and is forfeited if not raised below"]; accord *People v.*

---

[5]      Several courts have disagreed with *Morrison*'s reasoning that trial courts have this discretion. (See, e.g., *People v. Tirado* (2019) 38 Cal.App.5th 637, 644, review granted Nov. 13, 2019, S257658; see also *People v. Yanez* (2020) 44 Cal.App.5th 452, 458, review granted Apr. 22, 2020, S260819.)

[6]      *Morrison* was decided in 2019. The hearing from which defendant appeals took place in 2020, well after *Morrison*.

10

*Speight* (2014) 227 Cal.App.4th 1229, 1247; *People v. Russell* (2010) 187 Cal.App.4th 981, 993.)  It is also meritless.

The United States Supreme Court has emphasized that "children are constitutionally different from adults for purposes of sentencing" (*Miller v. Alabama* (2012) 567 U.S. 460, 471 (*Miller*)) and has held sentences of life in prison without the possibility of parole are cruel and unusual with respect to certain juvenile offenders.  But the high court has also held that a *Miller* violation may be remedied "by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." (*Montgomery v. Louisiana* (2016) 577 U.S. 190, 212 [citing Wyoming statute making juvenile homicide offenders eligible for parole after 25 years].)

Pursuant to section 3051, subdivision (b)(3), enacted as part of a statutory scheme intended "explicitly to bring juvenile sentencing into conformity with" *Miller*, and other case law (*People v. Franklin* (2016) 63 Cal.4th 261, 277 (*Franklin*)), defendant will be eligible for parole during his 25th year of incarceration—i.e., before his 44th birthday.  Notwithstanding defendant's unsupported assertions that this amounts to "a de facto life without the possibility of parole sentence" and "he is likely to spend his entire life in state prison," our Supreme Court has held that "[s]uch a sentence is neither LWOP nor its functional equivalent." (See *id.* at 280 [holding challenge to sentence of 50 years to life under which juvenile offender would first become eligible for parole at age 66 was mooted by section 3051 and related statutes].)  There is accordingly no constitutional violation.[7] (*Ibid.*)

---

[7] Our Supreme Court in *Franklin* noted it "express[ed] no view" as to the viability of *Miller* claims brought by juvenile

DISPOSITION

The trial court's order is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.

We concur:


RUBIN, P. J.


KIM, J.

---

offenders not entitled to a youth offender parole hearing under section 3051 or "who are serving lengthy sentences imposed under discretionary rather than mandatory sentencing statutes." (*Franklin*, *supra*, at 280.)  In this case, the longer portion of defendant's sentence—the firearm enhancement—was discretionary.  But if the availability of a youth offender parole hearing "precludes a lengthy mandatory sentence from being considered the functional equivalent of LWOP, we perceive no reason the same would not be true with respect to the sentence[ ] imposed here, a portion of which was mandatory and the remainder discretionary." (*People v. Cornejo* (2016) 3 Cal.App.5th 36, 68.)