Filed 8/16/22  P. v. Espinoza CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JORGE ANTONIO ESPINOZA et al.,<br><br>Defendants and Appellants. | B307621<br><br>(Los Angeles County Super. Ct. No. YA013704) |

APPEALS from orders of the Superior Court of Los Angeles County, Nicole C. Bershon, Judge.  Affirmed.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant Jorge Antonio Espinoza.

Kelly C. Martin, under appointment by the Court of Appeal, for Defendant and Appellant Antonio Silva.

Law Office of Stein and Markus, Andrew M. Stein, Joseph A. Markus and Brentford Ferreira for Defendant and Appellant Alfredo Sanchez Espinoza.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Amanda V. Lopez and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

In 1992, Jorge Antonio Espinoza, Alfredo Sanchez Espinoza,[1] and Antonio Silva (collectively, defendants) committed an armed home-invasion robbery and then fled the police in a car driven by a coparticipant in the crime. The car ran a stop sign and crashed into another vehicle, killing two of its occupants and injuring two others. At the time of the crime, Alfredo was 17 years old and both Jorge and Silva were 19 years old. Defendants were convicted of two counts of first degree felony murder for the deaths of the two victims killed in the collision.

In 2019, each defendant filed a petition for resentencing under Penal Code[2] section 1170.95 (now § 1172.6).[3] Following an evidentiary hearing, the superior court denied each petition based on a finding that defendants were not entitled to relief under section 1170.95 because they were major participants in the felony and acted with reckless indifference to human life.

On appeal, each defendant argues the evidence was insufficient to support the superior court's finding that he

———————————

[1] Because Alfredo Espinoza and Jorge Espinoza share the same last name, we refer to them by their first names for clarity.

[2] Unless otherwise stated, all further statutory references are to the Penal Code.

[3] Effective June 30, 2022, the Legislature renumbered Penal Code section 1170.95 to section 1172.6 with no change in text. (Stats. 2022, ch. 58, § 10.) For purposes of clarity and conformity with the petition, we will continue to refer to the statute as section 1170.95 throughout the opinion.

was ineligible for section 1170.95 relief. Silva also asserts the superior court erred in refusing to consider youth as a relevant factor in ruling on the petitions, and in relying on certain inadmissible evidence in violation of section 1170.95 and the Sixth Amendment confrontation clause. We affirm.

## BACKGROUND

## I.     The underlying crimes

On the evening of November 7, 1992, defendants committed an armed robbery at a residence in Hawthorne, California. A fourth man, Rutilo Aguilera, waited in a car outside the residence and acted as the getaway driver. The group was also joined by an unidentified woman.

At the time of the robbery, 16-year-old Norma Barraza was inside the residence with her young niece and nephew, both of whom were under the age of 10. Barraza heard a knock on the front door and a voice asking for Robert. After Barraza responded that no one named Robert lived there, she stood behind the door with her hand on the knob waiting for the person to leave. A shotgun blast suddenly ripped through the doorknob, injuring Barraza's hand. The door was then kicked open. Silva, armed with a 12-gauge sawed-off shotgun, and Alfredo, armed with a chrome .44 Magnum handgun, both entered the home. Jorge, armed with a black .40-caliber semiautomatic handgun, remained at the doorway, acting as a lookout.

Once inside the home, one of the men ordered Barraza's niece and nephew to get on the ground. The children complied and were taken to the living room where they sat on the sofa. Barraza initially ran into a bedroom to hide, but was found by the men and taken to the kitchen. Alfredo pointed his gun at Barraza and the two children. Alfredo also threatened to kill

3

Barraza, and Silva threatened to rape her. Alfredo and Silva rummaged through the home. They took Barraza's ring from a drawer inside a bedroom. After about three minutes, Jorge saw the police and told his companions, "Let's go."

Defendants ran from the residence into the waiting car. A neighbor who saw the men fleeing the home observed that one of them held a white bag in his hand. The car, driven by Aguilera, took off down the street with the police in close pursuit. About a block and a half from the residence, the car ran a stop sign and then crashed into another vehicle. That vehicle was occupied by Indricka Kelsey, her young daughter, her friend Ida Logan, and Logan's young daughter Jameshia Perkins. Logan and her daughter died as a result of injuries sustained in the collision. Kelsey and her daughter survived the collision, but suffered serious injuries. The driver of the getaway car, Aguilera, also died from injuries sustained in the collision.

Immediately following the collision, one to two shots were fired from the getaway car.[4] Defendants and their female companion then fled the scene on foot. A police officer pursuing the suspects saw Alfredo with a chrome gun as he ran away. Alfredo was found hiding a short distance from the scene of the collision and was arrested at that time. Jorge was arrested a few days later. Silva and the female suspect ran into a nearby

---

[4] Following Alfredo's arrest, he tested positive for gunshot residue on his hands, and the chrome revolver that he carried during the robbery was found with one expended casing and five unspent cartridges inside the cylinder. The prosecution's theory at trial was that Alfredo fired the gun from inside the getaway car, possibly to shoot out the window of the crashed car as a means of escape.

laundromat and asked a customer for a change of clothes. After changing clothes, Silva and the woman returned to the scene of the collision to see what was happening, and then left.

A chrome revolver and a white bag containing money were found near the area where Alfredo and Jorge were seen running. A sawed-off shotgun containing four shells, a loaded .40-caliber handgun, and a large quantity of heroin were recovered from inside the getaway car.

In an interview with the police following his arrest, Alfredo admitted he had participated in the robbery. He identified his coparticipants by their purported gang monikers, and denied knowing their true names. According to Alfredo, the group committed the robbery because "Chuco" said that some people at the residence owed him money. Chuco and "Spider" searched the residence, and after Chuco threatened the female victim, she told them where the money was located. Defendants then fled the home with a bag of money and were passengers in a car driven by "Big Boy" when the collision occurred.

In his interview with the police, Silva also admitted he was involved in the robbery. The detective who interviewed Silva provided a detailed description of his statements to the police at Silva's preliminary hearing. According to Silva, the driver of the car, Aguilera, asked Silva to help him commit the robbery because people at the residence had "ripped him off" in a drug deal.[5] Aguilera supplied the guns used in the crime, including a shotgun that he gave to Silva. Silva described the weapon as a

_____

[5] Shortly after the crime, Jorge told a friend that the group had committed the robbery to "[j]ack a dope dealer," but "it didn't work out."

5

terminator-style shotgun. While Aguilera stayed in the car, Silva fired a shot through the door, and then defendants went inside the home. They stole drugs and a bag of money and fled in the car when they saw the police were coming. Aguilera said he was not going to jail and crashed into another car when he ran a stop sign. After the crash, Silva heard a shot but did not know who had fired it. He got out of the car and ran from the scene. Silva told the police that he felt guilty about what had happened because he later learned from the news a child had been killed in the collision. Silva also said that he had asked the driver of the getaway car to stop once he realized the police were on the scene.

## II. Defendants' convictions and sentences

In 1994, following a joint trial before a jury, Jorge and Alfredo were each found guilty as charged of two counts of first degree murder (§ 187, subd. (a)), two counts of assault with a deadly weapon (§ 245, subd. (a)(1)) two counts of assault with a firearm (§ 245, subd. (a)(2)), one count of first degree residential robbery (§ 211), one count of first degree residential burglary (§ 459), and one count of shooting at an inhabited dwelling (§ 246). Various firearm enhancement allegations (§§ 12022, subd. (a)(1), 12022.5, subd. (a)) were found to be true as to each of them. Jorge and Alfredo were each sentenced to 66 years and 8 months to life in state prison.

In 1996, as part of a plea agreement, Silva pleaded guilty to two counts of first degree murder (§ 187, subd. (a)) and admitted two firearm enhancement allegations (§12022, subd. (a)(1)). All remaining counts and allegations against him were dismissed. Silva was sentenced to 50 years to life in state prison.

Jorge filed an appeal from his judgment of conviction. In an unpublished opinion filed on December 24, 1996, this court

affirmed the judgment against Jorge. (*People v. Espinoza* (Dec. 24, 1996, B086254) [nonpub. opn.].)

### III. Defendants' petitions for resentencing

In 2019, defendants each filed a petition for resentencing under section 1170.95. Each defendant alleged he was entitled to relief under the newly enacted statute because he was convicted of murder pursuant the felony-murder rule or the natural and probable consequences doctrine, he was not the actual killer, he did not aid or abet a murder with the intent to kill, and he was not a major participant in the underlying felony and did not act with reckless indifference to human life.

In support of his petition, Silva attached a sworn declaration in which he stated that he "only agreed to the robbery or burglary, not . . . a murder [he] never fathomed." He further stated that once the group left the residence and the police began chasing them, he "repeatedly told the driver of the vehicle to pull over and stop so [he] could jump out but the driver refused." Silva also supported his petition with his 1996 postplea probation report, and with the factual background section of this court's prior opinion in Jorge's appeal. The probation report reflected that Silva told the probation officer that he did not believe the murder charges were fair because he had asked the driver of the getaway car to stop, but the driver refused.

The People filed a response to each defendant's petition. Among other arguments, the People asserted defendants were not entitled to relief under section 1170.95 because each of them was a major participant in the robbery and acted with reckless indifference to human life. The People supported their responses with various documents, including this court's prior opinion in Jorge's appeal, defendants' preliminary hearing transcripts, and

defendants' presentencing probation reports. Defendants filed replies in which they argued they were not liable for murder because their actions during the robbery did not play a role in the car collision that led to the victims' deaths. In support of his reply, Alfredo attached the transcripts from his and Jorge's joint trial.

On September 2, 2020, the superior court held a combined evidentiary hearing on the petitions after finding each defendant had established a prima facie case for relief. At the hearing, the parties did not offer any new or additional evidence, but rather relied on the evidence previously submitted with the briefing. Following extensive argument from counsel, the court denied the petitions, finding each defendant was a major participant in the robbery and acted with reckless indifference to human life. In articulating the basis for its ruling, the court noted that the case presented "a strange scenario" in which defendants "were all present for the shooting that didn't lead to the death[,] but they were also all present for the action that led to the death." While acknowledging that "there isn't one factor that's overarching," the court cited defendants' armed participation in the robbery of a known drug residence, their violent conduct during the robbery which included shooting through the door and pointing a gun at young children, their decision to get into a fleeing car once they became aware the police were coming, their presence in the car at the time of the deadly collision, and their decision to flee the scene of the collision rather than render aid to the victims. The court also noted that, over the course of the robbery and escape, defendants had multiple opportunities to stop the crime, but did not do so. While recognizing the "relatively young age" of defendants at the time of the robbery, the court explained it could

8

not evaluate their culpability "from the mind of a 17-year-old or 18-year-old" in deciding whether they were entitled to section 1170.95 relief.

Following the denial of their petitions, each defendant filed a timely notice of appeal.

## DISCUSSION

On appeal, defendants contend the superior court committed reversible error in denying their section 1170.95 petitions. Defendants claim the evidence was insufficient to support the superior court's findings that each of them was a major participant in the underlying felony and acted with reckless indifference to human life, and was thus guilty of felony murder.[6] In a related argument, Silva also asserts the superior court misapplied the law when it declined to consider his youth at the time of the offense in determining whether he acted with reckless indifference to human life. In supplemental briefing permitted by this court, Silva further argues the superior court erred in admitting certain evidence against him in violation of section 1170.95, subdivision (d)(3) and the Sixth Amendment right of confrontation.

## I. Overview of section 1170.95

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) amended murder liability under

---

[6] In Alfredo's opening brief, he suggests the superior court may have found that defendants were guilty of murder under a theory of imputed malice. This is incorrect. The superior court found that defendants were guilty of felony murder because they were major participants in the robbery and acted with reckless indifference to human life. The superior court did not make any finding as to whether defendants were guilty of malice murder.

9

the felony murder rule and natural and probable consequences doctrine. (*People v. Lewis* (2021) 11 Cal.5th 952, 957; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843.) It amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration or attempted perpetration of qualifying felonies is liable for felony murder only if the person: (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor in the murder; or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d). (*Gentile*, at p. 842.) It amended the natural and probable consequences doctrine by adding section 188, subdivision (a)(3), which states that malice shall not be imputed to a person based solely on his or her participation in a crime. (*Gentile,* at pp. 842–843.)

Senate Bill 1437 also added section 1170.95, which created a procedure whereby persons convicted of murder under a now-invalid felony murder or natural and probable consequences theory may petition the superior court to vacate the murder conviction and resentence the petitioner on any remaining counts. (*People v. Lewis*, *supra*, 11 Cal.5th at p. 959; *People v. Gentile, supra*, 10 Cal.5th at p. 843.) Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775), which took effect on January 1, 2022, amended section 1170.95 to allow persons convicted of attempted murder or manslaughter under a felony murder or natural and probable consequences theory to seek the same relief under the statute. (Stats. 2021, ch. 551, § 2.)

As amended by Senate Bill 775, section 1170.95 provides that a petitioner is eligible for relief if he or she: (1) was charged

with murder or attempted murder by means of a charging document that allowed the prosecution to proceed under the felony-murder rule, natural and probable consequences doctrine, or other theory under which malice is imputed to a person based solely on his or her participation in a crime; (2) was convicted of murder, attempted murder, or manslaughter; and (3) could no longer be convicted of murder or attempted murder due to the changes to sections 188 and 189 effectuated by Senate Bill 1437. (§ 1170.95, subd. (a).)

If a petitioner makes a prima facie showing of entitlement to relief, the superior court must issue an order to show cause (§ 1170.95, subd. (c)), and hold an evidentiary hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to resentence the petitioner (§ 1170.95, subd. (d)(1)). At that hearing, the prosecution has the burden of proving beyond a reasonable doubt that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to sections 188 and 189. (§ 1170.95, subd. (d)(3).) If the prosecution fails to sustain its burden of proof, the court must vacate the conviction and any allegations and enhancements attached to it, and resentence the petitioner on the remaining counts. (§ 1170.95, subd. (d)(3).)

On appeal from an order denying a section 1170.95 petition following an evidentiary hearing, we review the superior court's factual findings for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; *People v. Garrison* (2021) 73 Cal.App.5th 735, 747.) "We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a

11

rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 298.)

## II. Substantial evidence supported the superior court's findings that defendants were not entitled to relief under section 1170.95

Defendants contend the superior court erred in finding that they were not eligible for relief under section 1170.95 because the People failed to prove beyond a reasonable doubt that they were guilty of felony murder under the newly amended law. Defendants specifically challenge the sufficiency of the evidence supporting the superior court's findings that they were major participants in the robbery and acted with reckless indifference to human life. Considering the totality of the record, we conclude these findings were supported by substantial evidence.

### A. *Governing law on felony murder*

As amended by Senate Bill 1437, section 189, subdivision (e)(3), provides that a participant in certain felonies, including robbery, in which a death occurs is liable for murder if he or she was "a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2," the felony-murder special circumstance statute. Section 190.2, subdivision (d), in turn states that "every person, not the actual killer, who, with reckless indifference to human life and as a major participant" aids or abets an enumerated felony that results in death may be convicted of special circumstance murder and sentenced to death or imprisonment for life without parole. "The statute, by its text, imposes an actus reus requirement, major participation in the enumerated felony, and a mens rea requirement, reckless

12

indifference to human life."  (*In re Scoggins* (2020) 9 Cal.5th 667, 674.)

Roughly 20 years after defendants' convictions in this case, the California Supreme Court in *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) clarified the meaning of the "major participant" and "reckless indifference" requirements of section 190.2, subdivision (d).  The *Banks* court identified a nonexclusive list of factors for determining whether an aider and abettor was a major participant in the underlying felony:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Banks*, at p. 803, fn. omitted.)  With respect to the reckless indifference element, *Banks* explained that "[r]eckless indifference to human life 'requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave risk of death." ' "  (*Id*. at p. 807.)  "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies" the mens rea requirement.  (*Id*. at p. 808.)

The following year, in *Clark*, *supra*, 63 Cal.4th at pages 616 to 618, the Supreme Court further elaborated on the mental state required to demonstrate reckless indifference to human life.  As

13

*Clark* explained, the reckless indifference element of a felony-murder special circumstance finding "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) The requisite state of mind is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Id.* at p. 616.) Reckless indifference to human life thus has both a subjective and objective component. (*Id.* at p. 617.) Subjectively, the defendant must consciously disregard risks known to him or her. (*Ibid.*) Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether the defendant's conduct " 'involve[d] a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Ibid.*) The fact that a robbery involved a gun, by itself, is insufficient to support a finding of reckless indifference to human life. (*Id.* at p. 617.)

Ω *Clark* also provided a nonexclusive list of factors to consider in evaluating whether a defendant acted with reckless indifference to human life: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins, supra,* 9 Cal.5th at p. 677 [summarizing *Clark* factors].) Like the *Banks* factors, " '[n]o one

14

of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, *supra*, 63 Cal.4th at p. 618.)

### B. *Substantial evidence supported the findings that defendants were guilty of felony murder*

Viewing the record in the light most favorable to the superior court's ruling, we conclude the evidence was sufficient to support its findings that defendants were guilty of felony murder because they were major participants in the robbery and acted with reckless indifference to human life. The evidence showed that defendants were present for the entire sequence of events that culminated in the victims' tragic deaths. While it is unclear to what extent defendants helped formulate the plan for the robbery, each of them agreed to participate in the robbery of a known drug residence armed with guns.

Each defendant was carrying a loaded firearm when the group approached the residence and first attempted to gain entry through a ruse. Each defendant also was aware that the residence was occupied once Barraza replied that the person they were looking for did not live there and refused to open the door. Seconds later, and without warning, Silva fired the sawed-off shotgun at the door, leaving a hole underneath the doorknob and causing a fragment from the shattered door to injure Barraza's hand. Silva's act of firing a shotgun blast through the front door clearly did not reflect an effort to minimize the risk of violence to the occupants of the residence, but rather was an escalation of violence against these young victims.

The evidence further showed that defendants entered the residence displaying their firearms. Defendants then acted as a team with each of them in a defined role. While Silva and Alfredo rummaged through the home searching for items to take,

Jorge stood at the doorway of the entrance, holding a loaded semiautomatic handgun and serving as a lookout. This was evidence of a preplanned, organized effort. Jorge's role as the lookout also supported an inference that the group was planning to make a hasty escape. As the superior court noted, the purpose of a lookout is "to get out, get out quickly, [and] flee the police."

During the course of the robbery, the violence inside the residence continued to escalate. Alfredo pointed his fully loaded revolver at Barraza and the two young children who were inside the home. Both Alfredo and Silva also made threats of violence against Barraza, with Alfredo threatening to kill Barraza and Silva threatening to rape her. Defendants fled the residence together once Jorge alerted his companions that the police were coming. Based on such evidence, the superior court reasonably could infer that, at this point in the robbery, each defendant was aware of and willingly involved in the violent manner in which the crime was being committed, and knowingly had engaged in criminal activities that carried a grave risk of death. (*People v. Banks*, *supra*, 61 Cal.4th at pp. 801, 803; *Clark*, *supra*, 63 Cal.4th at p. 616.)

The superior court also reasonably could infer that once defendants exited the residence with the police in close pursuit, each of them was faced with a choice. They could surrender to the police, attempt to flee the scene on foot, or try to escape in the car driven by Aguilera. Given that the police were rapidly approaching the scene, defendants could have anticipated that Aguilera would be driving the getaway car at a high rate of speed to evade the pursuing officers, thus endangering the lives of the car's occupants and other passing motorists. Defendants still chose the getaway car. None of them sought to minimize the risk

of violence posed by a high speed car chase by surrendering or trying to flee the scene on foot.[7]  A short distance from the residence, while being chased by the police, Aguilera ran a stop sign and crashed into another vehicle, killing two of its occupants and himself and seriously injuring two others.  Each defendant was present in the getaway car when the fatal crash occurred.

The evidence also demonstrated that, immediately after the crash, one of defendants, likely Alfredo, fired his weapon from the car.  Defendants then ran from scene of the collision with Alfredo still carrying his gun and Jorge holding a bag of money taken from the residence.  None of defendants called for assistance or attempted to render aid to the victims of the crash.  While Silva later returned to the scene of the collision, he did so only briefly after changing his clothes at a nearby laundromat so that he would not be recognized.  On this record, the totality of

---

[7] Silva argues that he told the detective shortly after his arrest, and later the probation department, that he had asked Aguilera to stop the car once he saw the police were there.  At the evidentiary hearing on the section 1170.95 petitions, however, the superior court did not find Silva's statement about wanting to stop the car to be credible, describing it as a "very self-serving statement" that was not corroborated by the other defendants.  As the fact finder at that hearing, the superior court was required to "review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility." (*People v. Clements*, *supra*, 75 Cal.App.5th at p. 298.)  While Silva seeks to challenge the superior court's credibility determination about his statement on appeal, "[t]he reviewing court does not reweigh the evidence or determine credibility anew." (*People v. Price* (2021) 71 Cal.App.5th 1128, 1154, review granted Feb. 9, 2022, S272572.)

17

defendants' conduct during the robbery and flight supported a finding that each of them was a major participant in the felony and exhibited a reckless disregard for human life.

In arguing that the evidence was insufficient to support the findings that they were guilty of felony murder, defendants focus on the period of time inside the getaway car rather than inside the residence. In particular, defendants assert that the deaths in this case did not occur during the "actual robbery" inside the home, but rather were the result of the car accident that took place after the robbery as they were attempting to flee the scene. Defendants further claim that, at the time of the collision, they were mere passengers in the car driven by Aguilera, at which point they had no ability to control Aguilera's conduct or to prevent the collision from occurring.

It is well-established, however, that " ' "[t]he crime of robbery is not confined to the act of taking property from victims." ' " (*People v. Debose* (2014) 59 Cal.4th 177, 205.) Rather, "the commission of a robbery is ongoing ' "until the robber has won his way to a place of temporary safety." ' [Citation.] A robber has not reached a place of temporary safety while an immediate and active pursuit to recover the property is in progress." (*Ibid.*) Additionally, under the doctrine known as the escape rule, a " 'killing committed by a robber during his or her flight from the scene of the crime, and before reaching a place of temporary safety, comes within section 189.' " (*People v. Wilkins* (2013) 56 Cal.4th 333, 341.) Even where the killing is unintentional, " '[f]elony-murder liability continues throughout the flight of a perpetrator from the scene of a robbery until the perpetrator reaches a place of temporary safety because the robbery and the accidental death, in such a case, are parts of a

18

"continuous transaction." ' " (*Id*. at p. 345.) Appellate courts accordingly have upheld felony-murder convictions in cases where the defendant accidentally killed another motorist in a vehicle collision that occurred as the defendant was fleeing the scene and had not yet reached a place of temporary safety. (See, e.g., *People v. Russell* (2010) 187 Cal.App.4th 981, 991–992 [shortly after fleeing scene of burglary, defendant was observed by police and began driving at high rate of speed, causing traffic collision that killed victim]; *People v. Thongvilay* (1998) 62 Cal.App.4th 71, 79–80 [while being pursued in his car by witness to burglary, defendant ran a red light and crashed into another vehicle, killing victim]; *People v. Johnson* (1992) 5 Cal.App.4th 552, 561–562 [defendant fled scene of robbery in stolen car and accidentally struck another motorist, causing her death].)

Here, there is no dispute that the vehicle collision that killed the victims occurred moments after defendants had fled the scene of the robbery and before they had reached a place of temporary safety. The crime was therefore ongoing when the fatal crash occurred, and the robbery and the deaths were part of one continuous transaction. While Aguilera was the person who actually killed the victims through his reckless driving, under the felony-murder rule, as amended by Senate Bill 1437, defendants remained liable for murder if they were major participants in the robbery and acted with reckless indifference to human life. In determining defendants' culpability, the superior court properly considered their conduct during the entire sequence of events that resulted in the victims' deaths. Contrary to defendants' contention on appeal, the court did not focus solely on their violent actions inside the residence while discounting their lack

19

of violence inside the getaway car. Rather, the record reflects that the court examined the totality of each defendant's conduct, from the time the group first approached an inhabited residence armed with loaded guns to the time they chose to flee the scene of the crash on foot rather than aid the victims. While defendants may not have been able to prevent the collision from occurring once they became passengers in the speeding getaway car, the totality of their conduct during the robbery and flight demonstrated a conscious disregard for the grave risk of death that their actions created. Under these circumstances, there was substantial evidence to support the superior court's findings that each defendant was a major participant in a felony resulting in death, and acted with reckless indifference to human life.

### III.   Silva has not shown prejudicial error in the alleged failure to consider defendants' youth

Silva argues the superior court misapplied the law when it expressly declined to consider his young age at the time of the offense in deciding whether he was entitled to relief under section 1170.95.[8] We conclude the alleged error in failing

_____

[8] While Jorge expressly joined in the arguments raised by his coappellants to the extent they may benefit him, Alfredo did not do so. Ordinarily, a party's failure to join in a coappellant's claim, or to provide particularized argument as to why a claim accrues to that party's benefit, forfeits the issue on appeal. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363.) However, because Alfredo was a minor at the time of the offense and the superior court did not distinguish between defendants in its comments regarding how their youth factored into its analysis, we exercise our discretion to treat Silva's argument as accruing to the benefit of each defendant, including Alfredo.

20

to consider defendants' youth was harmless because it is not reasonably probable that any of defendants would have achieved a more favorable result in the absence of the purported error.

At the evidentiary hearing, both counsel for Alfredo and counsel for Silva identified youth as a factor in arguing why their clients were not culpable for felony murder. Alfredo's counsel noted that Alfredo was "a 17-year-old young man" when "he was involved in a robbery [in] which he did not commit any acts of aggression or shooting the gun," the "conduct during the robbery did not evolve into a death," and the "death in this case was an unintended victim . . . as a result of a traffic accident." Silva's counsel pointed out that his client "was 19 when he foolishly agreed to participate in this robbery," and that he "never contemplated a car chase, a deadly crash." Silva's counsel also noted that, during the robbery, Silva used the shotgun "as a tool" to gain entry into the residence and "didn't think anybody would be hurt or killed by him shooting at the lock of the door."

After considering the *Banks* and *Clark* factors and finding that each defendant was a major participant in the robbery and acted with reckless indifference to human life, the superior court stated, "Now . . . I'm not ignoring their relatively young age. I get that and I'm cognizant of that. But I don't believe . . . the case law says I have to look at . . . what would a 17 or 18-year-old do. Do I evaluate it from the mind of a 17-year-old or 18-year-old? I don't think that's what the case law says. Those considerations come into play potentially in decisions. Do we charge special circumstances? They can't get LWOP, I believe, if they were juveniles at the time. I think that's the current state of the law. . . . [¶] . . . [¶] But then it's also for the parole board to make

21

those determinations.  If there are any *Franklin* hearings,[9] those issues come into play down the line.  But not at this juncture."

Since the superior court's ruling in this case, several appellate courts have held that a juvenile defendant's youth at the time of the offense is relevant to determining whether he or she was a major participant in the felony and acted with reckless indifference to human life.  (See, e.g., *In re Moore* (2021) 68 Cal.App.5th 434; *People v. Harris* (2021) 60 Cal.App.5th 939, review granted Apr. 28, 2021, S267802; *People v. Ramirez* (2021) 71 Cal.App.5th 970.)  In *Moore*, for instance, the defendant, who was 16 years old when he participated in a deadly armed robbery, challenged the sufficiency of the evidence supporting a robbery-murder special circumstance finding.  (*Moore*, at p. 439.)  In vacating that finding, the *Moore* court concluded that "a defendant's youth at the time of the offense should be a factor in determining whether that defendant acted with reckless

---

**9** A person convicted of a controlling offense committed when he or she was under the age of 26 is entitled to a youth offender parole hearing during the 15th year of incarceration if he or she received a determinate sentence; during the 20th year of incarceration if he or she received a life term of less than 25 years to life; and during the 25th year of incarceration if he or she received a term of 25 years to life.  (§ 3051, subd. (b)(1)–(3).)  Recognizing that assembling information on youth-related mitigating factors is a task more easily accomplished at the time of sentencing rather than decades later at a parole hearing, the Supreme Court in *People v. Franklin* (2016) 63 Cal.4th 261 held a defendant must be permitted at the time of sentencing to make a record of those factors, a proceeding that has since become known as a *Franklin* hearing.  (See *In re Cook* (2019) 7 Cal.5th 439, 459.)

indifference to human life," and that the evidence failed to establish that Moore had acted with the requisite mental state. (*Ibid*.) *Moore*, at page 454, explained, "Moore, as a 16 year old, lacked ' "the experience, perspective, and judgment" ' to adequately appreciate the risk of death posed by his criminal activities. [Citations.] To the extent the *Clark* factors . . . support a finding of reckless indifference for an adult—an issue we do not decide today—those factors undoubtedly preclude such a finding when viewed from the lens of Moore's youth." (See *Harris*, at p. 960 [given 17-year-old defendant's "youth at the time of the crime . . . [citations], it is far from clear that [he] was actually aware 'of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants' "]; *Ramirez*, at p. 990 [15-year-old defendant's "youth at the time of the shooting greatly diminishes any inference he acted with reckless disregard for human life by participating in the attempted carjacking knowing [his coparticipant] was armed"].)

Relying on these recent cases, Silva asserts the superior court misapplied the law when it refused to consider Silva's age at the time of the offense in determining whether he had acted with reckless indifference to human life. As Silva acknowledges, however, the defendants in *Moore*, *Harris*, and *Ramirez* were all juveniles at the time of the relevant crime. The United States Supreme Court precedent on which these decisions relied also involved juvenile offenders. (See, e.g., *J. D. B. v. North Carolina* (2011) 564 U.S. 261, 265 [*Miranda*[10] custody analysis must include consideration of 13-year-old suspect's age]; *Miller v.*

---

[10] *Miranda v. Arizona* (1966) 384 U.S. 436.

*Alabama* (2012) 567 U.S. 460, 465 [mandatory sentences of life without parole for 14-year-old defendants convicted of murder violated Eighth Amendment]; *Graham v. Florida* (2010) 560 U.S. 48, 52–53 [16-year-old defendant's sentence of life without parole for nonhomicide crime violated Eighth Amendment].) While Alfredo was 17 years old at the time of the robbery in this case, both Jorge and Silva were 19 years old, and thus, young adults.

Even assuming without deciding that the age of a young adult offender is also a relevant factor in the major participant and reckless indifference analysis, any error in failing to consider the age of each defendant in this case was harmless. To begin with, the record is not clear whether the superior court actually refused to give any consideration to defendants' youth in deciding whether they were entitled to section 1170.95 relief. While the court did state that the case law did not allow it to evaluate the culpability of defendants "from the mind of a 17-year-old or 18-year-old," it also noted that it was cognizant of their "relatively young age" at the time of the offense and was "not ignoring" that fact. In any event, to the extent that the superior court may have erred by refusing to consider defendants' youth, there is no reasonable probability that any of defendants would have obtained a more favorable result if the court had taken this one additional factor into account.[11]

_____

[11] Citing the standard for prejudice articulated in *Chapman v. California* (1967) 386 U.S. 18, Silva contends the alleged failure to consider his age as a relevant factor in ruling on his section 1170.95 petition requires reversal because the error was not harmless beyond a reasonable doubt. However, the right to a postconviction proceeding for resentencing pursuant to section 1170.95 is purely a creation of state law. We therefore

24

As discussed, there was substantial evidence that each defendant actively participated in the violent home-invasion robbery, and was subjectively aware that his participation in the crime involved a grave risk of death. Each defendant was physically present during all aspects of the robbery and escape that culminated in the victims' deaths. Silva fired a 12-gauge sawed-off shotgun through the front door of the residence, rummaged through the home searching for drugs and money, and threatened to sexually assault Barraza inside the home. Jorge played an important role as the lookout by standing guard at the door of the residence with a loaded semiautomatic gun and alerting his companions once he saw that the police were close to the scene. Alfredo, the only juvenile in the group, pointed his loaded gun at the young children inside the home, threatened to kill Barraza, fired his weapon from the car after the crash occurred, and ran from the car, still maintaining possession of his weapon. Defendants then chose to run from the scene of

---

evaluate the error for prejudice under the harmless error standard for state law error articulated in *People v. Watson* (1956) 46 Cal.2d 818, not the standard for federal constitutional error set forth in *Chapman*. (See *People v. Lewis*, *supra*, 11 Cal.5th at p. 957 [applying *Watson* standard to error in failing to appoint counsel prior to determining whether petitioner stated prima facie case for relief under section 1170.95]; *People v. Myles* (2021) 69 Cal.App.5th 688, 706 [applying *Watson* standard to error in admitting certain evidence at section 1170.95 hearing].) The *Watson* standard requires us to evaluate whether the defendant has shown that it is " 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Watson*, at p. 837; accord, *People v. Gonzalez* (2018) 5 Cal.5th 186, 195.)

the collision rather than aid the victims. While defendants were relatively young when they participated in the crime, the evidence did not show that any of them "lacked ' "the experience, perspective, and judgment" ' to adequately appreciate the risk of death posed by his criminal activities." (*People v. Moore*, *supra*, 68 Cal.App.5th at p. 454.) Rather, even considering defendants' youth at the time of the offense as a relevant factor, the totality of the circumstances supported the superior court's findings that each defendant was a major participant in the robbery and acted with reckless disregard for human life.

## IV. Silva has not shown prejudicial error in the alleged reliance on inadmissible evidence

In supplemental briefing, Silva also contends the superior court erred in denying his section 1170.95 petition because some of the evidence on which the court relied in finding him ineligible for relief is inadmissible under the recent amendments to section 1170.95. We conclude Silva forfeited his claim of error by failing to object to the evidence in the superior court, and even if not forfeited, the claim lacks merit because any alleged error in the admission of the challenged evidence was harmless in this case.

In addition to expanding the class of persons eligible for resentencing, Senate Bill 775 amended section 1170.95 to clarify the scope of evidence that may be considered at the evidentiary hearing. (Stats. 2021, ch. 551, § 2.) As amended, section 1170.95, subdivision (d)(3) now provides, in relevant part: "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence,

26

and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens."

Silva argues that, based on Senate Bill 775's amendments to section 1170.95, subdivision (d)(3), the superior court can no longer rely on hearsay evidence that is not subject to a specific exception to the hearsay rule. Silva specifically challenges the admissibility of (1) the hearsay testimony in the transcript of his preliminary hearing, (2) the hearsay statements in his probation report, and (3) the entirety of the transcript of his codefendants' trial because Silva was not a party to that proceeding.[12] Silva further contends that, under the amended

---

[12] In addition to arguing that this evidence now constitutes inadmissible hearsay under the amendments to section 1170.95, Silva asserts that admission of the evidence violated his Sixth Amendment right of confrontation. However, appellate courts consistently have held that the " 'retroactive relief provided by section 1170.95 reflects an act of lenity by the Legislature "that does not implicate defendants' Sixth Amendment rights." ' " (*People v. Silva* (2021) 72 Cal.App.5th 505, 520; see, e.g., *People v. James* (2021) 63 Cal.App.5th 604, 610; *People v. Perez* (2020) 54 Cal.App.5th 896, 908, review granted Dec. 9, 2020, S265254; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156.) Although Senate Bill 775 amended section 1170.95, subdivision (d)(3) to clarify the scope of evidence that is admissible at the evidentiary hearing, it did not provide petitioners with the right to confront

statute, only the procedural history portion of this court's prior opinion in Jorge's appeal is admissible.

As a threshold matter, Silva forfeited his claims regarding the admissibility of the evidence by failing to raise any objection to such evidence at the hearing before the superior court. A "challenge to the admission of evidence is not preserved for appeal unless a specific and timely objection was made below." (*People v. Anderson* (2001) 25 Cal.4th 543, 586; Evid. Code, § 353, subd. (a).) Here, Silva not only failed to object to any of the evidence below, but he attached some of the evidence about which he now complains—the probation report and the factual summary in this court's prior opinion—to his section 1170.95 petition. He therefore submitted and relied on the very evidence he now says should have been excluded. Even if his evidentiary claims had been preserved, however, Silva cannot show any prejudicial error in the admission of the challenged evidence.[13]

We need not decide whether the evidence that Silva seeks to challenge on appeal is no longer admissible under the amendments to section 1170.95. Assuming arguendo that the challenged evidence is inadmissible, any error in considering such material was harmless because the remainder of the evidence offered against Silva was sufficient to support the

---

witnesses at that hearing. Silva's confrontation clause claim thus fails.

[13] In light of our conclusion that admission of the evidence was harmless, we find it unnecessary to address Silva's claim that, to the extent he forfeited his evidentiary challenge on appeal, his counsel at the section 1170.95 hearing provided ineffective assistance by failing to object.

28

superior court's finding that he was guilty of felony murder. As Silva concedes, the portions of the preliminary hearing transcript in which the investigating officer related Silva's own statements to the police are admissible as a party admission under an exception to the hearsay rule. (Evid. Code, § 1220 [statement not made inadmissible by hearsay rule when offered against declarant in action to which he is party].) The officers also were permitted to testify as to their own personal observations because such testimony was not hearsay. (Evid. Code, § 1200 [hearsay is statement made other than by witness while testifying at hearing and is offered to prove truth of matter stated].)

As reflected in the preliminary hearing transcript, Silva gave a detailed interview to the police in which he admitted his involvement in the robbery. As described by Silva, Aguilera conceived of the plan to commit the robbery because he had been "ripped . . . off" in a drug deal at the residence. Aguilera supplied the weapons used in the crime and waited in the getaway car, while defendants went inside the home armed with guns. Silva admitted that he was armed with a "terminator style shotgun," and that he fired a shot through the front door. Silva also admitted that, upon entering the home, he and his companions encountered a young woman and children, and that they made the woman take them to different rooms as they searched for items to take. Silva recounted that, after taking money and drugs from the home, the group fled in the getaway car with the police in close pursuit and that he asked Aguilera to stop the car once he realized the police were there. Aguilera refused and crashed into another car when he ran a stop sign. Silva further recounted that, after fleeing on foot to a nearby laundromat

29

where he changed his clothes, he briefly returned to the scene of the accident "to see what was happening" and then left.

Based on Silva's own admissions to the police, the superior court reasonably could find that Silva was a major participant in the robbery and acted with reckless indifference to human life. While Silva did not describe the threats made to Barraza inside the residence, he admitted that he was present in the residence and in the car for the entire duration of the incident that resulted in the victims' death. Silva further admitted that each of the defendants was armed with a gun, which supported the inference that they anticipated the residence could be occupied during the evening and that they planned to use their weapons against the occupants to facilitate their crime. Silva also admitted that he fired a shotgun blast through the front door of the residence to gain entry, which the superior court reasonably could infer placed the individuals on the other side of the door at grave risk of harm. Moreover, Silva admitted that, immediately following the collision, he chose to run from the scene of the accident rather than aid the victims. On this record, there is no reasonable probability that Silva would have obtained a more favorable result on his section 1170.95 petition even if the superior court had excluded the challenged evidence. Silva accordingly has failed to satisfy his appellate burden of showing prejudicial error.

## DISPOSITION

The orders denying the petitions for resentencing filed by Jorge Antonio Espinoza, Alfredo Sanchez Espinoza, and Antonio Silva are affirmed.

NOT TO BE PUBLISHED.


KIM, J.[*]


We concur:


EDMON, P. J.


EGERTON, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

31